**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 11-2299

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM RIVERA-GARCIA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Thompson, Stahl, and Lipez,
Circuit Judges.

Jane Elizabeth Lee on brief for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, and Rosa Emilia Rodríques-Vélez, United States Attorney, on brief for appellee.

June 25, 2013

**STAHL, Circuit Judge**. After being ensnared in a law enforcement scheme aimed at exposing corrupt police officers in Puerto Rico, William Rivera-Garcia pled guilty to conspiracy to possess a controlled substance with intent to distribute, 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A). Rivera-Garcia now appeals his conviction, arguing that the government entrapped him in a manner so outrageous that his prosecution offends the Due Process Clause. Because Rivera-Garcia likely waived his right to make this claim on appeal, and because, in any event, he has failed to show plain error, we affirm.

## I. Facts & Background

Because this appeal stems from a conviction via a guilty plea, the following facts are drawn from the plea agreement, plea colloquy, and sentencing materials. See United States v. Whitlow, 714 F.3d 41, 42 (1st Cir. 2013).

The plea agreement included a stipulation of facts that described the following events:

> [B]eginning on or about June 3, 2009, and continuing until on or about June 4, 2009, [2] William Rivera Garcia, the defendant herein, and co-defendant [1] Arcadio Hernandez Soto agreed to provide "armed protection" for a drug transaction on behalf of a person who they both thought was a drug trafficker for a cash payment.
>
> On June 4, 2009, [2] William Rivera Garcia and [1] Arcadio Hernandez Soto arrived at an apartment in the District of Puerto Rico to

-2-

provide armed protection for the seller in a drug transaction that involved what they thought was cocaine. When the buyer arrived, [2] William Rivera Garcia and [1] Arcadio Hernandez Soto patted him down to make sure he was not armed or possessed any type of recording devices. The buyer was then allowed into the apartment where he was presented with a bag containing a quantity of sham cocaine. [2] William Rivera Garcia and [1] Arcadio Hernandez Soto both guarded the seller while the buyer inspected the kilograms in their presence and constructive possession. [2] William Rivera Garcia was armed with a firearm while this entire simulated drug transaction was taking place. The undersigned parties agree that the total quantity of cocaine attributable to [2] William Rivera Garcia was between 200 grams and 300 grams of cocaine.

After the buyer was allowed to leave with the sham cocaine, [2] William Rivera Garcia and [1] Arcadio Hernandez Soto were paid for their protective services.

Rivera-Garcia was paid $2,000 in cash.

Unbeknownst to Rivera-Garcia and his codefendant, however, the entire scheme was a government construct, aimed at apprehending corrupt police officers who were moonlighting as hired guns for drug dealers. (Rivera-Garcia himself was an ex-police officer at the time.) The buyer and seller were both government agents, and the drugs were fake. The apartment belonged to the government. Federal agents had used informants to make it known that "drug dealers" were hiring police officers to provide security for these sham transactions. Rivera-Garcia was recruited by his codefendant Arcadio Hernandez Soto, who in turn had been brought in by a government agent.

-3-

Rivera-Garcia was charged with, and pled guilty to, conspiracy to possess a controlled substance with intent to distribute, 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A). His plea agreement contained a waiver of his appellate rights, which read: "The defendant hereby agrees that if this Honorable Court accepts this plea agreement and sentences him according to its terms, conditions and recommendations, the defendant waives and surrenders his right to appeal the judgment and sentence in this case." At the change-of-plea hearing, the magistrate judge had the following colloquy with Rivera-Garcia about this waiver:

> THE MAGISTRATE: Do you understand that you can appeal your conviction if you believe the guilty plea was somewhat [sic] unlawful or involuntary or if there is some other fundamental defect in the proceedings which was not waived by a guilty plea?
>
> Do you understand that?
>
> DEFENDANT: Yes.
>
> . . .
>
> THE MAGISTRATE: Notwithstanding, Mr. Rivera, your Plea Agreement contains, in paragraph 15, a Waiver of Appeal, in which you agree that if the Court accepts the Plea Agreement and sentences you according to its terms, conditions and recommendation you waive and surrender your right to Appeal the Judgment and Sentence, in this case.
>
> Are you aware of the Waiver of Appeal?
>
> DEFENDANT: Yes.

-4-

    THE MAGISTRATE:  Have you discussed the Waiver
    of Appeal and its consequences with you [sic]
    counsel?

    DEFENDANT:  Yes.

The court found that Rivera-Garcia's plea was intelligent and voluntary and accepted it.  He was then sentenced to a total of eighty-four months' imprisonment.  This appeal followed.

## II.  Analysis

The crux of Rivera-Garcia's appeal is that the government scheme that snared him was so excessive, so outrageous, that it went beyond permissible law enforcement tactics and violated the Due Process Clause.  This argument relies on the "outrageous misconduct" doctrine, under which (in at least some formulations) a defendant's due process rights are violated when "law enforcement personnel become so overinvolved in a felonious venture that they can fairly be said either to have 'creat[ed]' the crime or to have 'coerc[ed]' the defendant's participation in it." United States v. Santana, 6 F.3d 1, 5 (1st Cir. 1993) (quoting United States v. Mosley, 965 F.2d 906, 911-12 (10th Cir. 1992)).  The government rejoins that this was little more than a run-of-the-mill sting operation, and that, in any event, Rivera-Garcia has waived the right to raise his outrageous-misconduct claim on appeal.

The government's waiver argument relies both on the express appellate waiver provision in Rivera-Garcia's plea agreement, described above, and on the general rule that a

defendant who knowingly and voluntarily pleads guilty "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Tollett v. Henderson, 411 U.S. 258, 267 (1973); see United States v. Broce, 488 U.S. 563, 569 (1989). Rivera-Garcia acknowledges these obstacles, but contends that his outrageous-misconduct claim is beyond the scope of the waiver clause in the plea agreement. He also argues that his claim fits within the narrow exception to the general guilty-plea waiver rule recognized in Blackledge v. Perry, 417 U.S. 21 (1974), and Menna v. New York, 423 U.S. 61 (1975) (per curiam). In those cases, the defendants had pled guilty, but the Supreme Court nevertheless allowed them to challenge their convictions on the basis that the government had violated their due process or double jeopardy rights in such a way that they could not constitutionally be haled into court at all. See United States v. De Vaughn, 694 F.3d 1141, 1150-53 (10th Cir. 2012) (describing these cases and their effect on the general guilty-plea waiver rule).[1]

---

[1]    The Blackledge-Menna exception to the guilty-plea waiver rule should not be (but often is) confused with the separate rule that a guilty plea does not waive jurisdictional defects in a conviction. See De Vaughn, 694 F.3d at 1153; United States v. Gonzalez, 311 F.3d 440, 442 (1st Cir. 2002). In fact, the government's brief in this case confuses these distinct concepts. To be clear: "A guilty plea waives all defenses except those that go to the court's subject-matter jurisdiction and the narrow class of constitutional claims involving the right not to be haled into court." De Vaughn, 694 F.3d at 1153 (emphasis added).

We are skeptical that Rivera-Garcia can escape the consequences of both his explicit waiver of his appellate rights and his guilty plea itself. It is true that some cases discussing the outrageous-misconduct doctrine have described it as "absolutely bar[ring] the government from invoking judicial processes to obtain a conviction," United States v. Russell, 411 U.S. 423, 431-32 (1973), which would appear to align it with the "right not to be haled into court" recognized in Blackledge, 417 U.S. at 30. But other courts have rejected the idea that Blackledge allows a defendant to raise any and all due process claims that implicate his right not to be brought into court, on the ground that "such a broad rule would allow any defendant to manufacture any sort of due process violation as a means of undermining the finality of a guilty plea." United States v. Doe, 698 F.3d 1284, 1291-92 (10th Cir. 2012); see also United States v. Elenes, 892 F.2d 84 (9th Cir. 1989) (unpublished table decision) (holding that the Blackledge-Menna exception did not apply to an outrageous-misconduct claim that was not evident from the face of the indictment).

However, we need not decide whether Rivera-Garcia can fit his claim into the Blackledge-Menna exception, because even if he can -- and even if he can likewise evade the express waiver clause in his plea agreement -- his outrageous-misconduct claim fails. Because this claim was not raised below, we review it only for plain error. Compare United States v. Luisi, 482 F.3d 43, 58 (1st

-7-

Cir. 2007) (reviewing preserved outrageous-misconduct claim de novo), with United States v. Sandlin, 589 F.3d 749, 758 (5th Cir. 2009) ("Our sister circuits have applied plain error review for claims of outrageous government conduct not preserved in the district court."). Under that familiar standard, a defendant must show that: (1) an error occurred; (2) that was clear or obvious, and not only (3) affected the defendant's substantial rights but also (4) impaired the fairness, integrity, or public reputation of the judicial proceedings. Puckett v. United States, 556 U.S. 129, 135 (2009); United States v. Zavala-Martí, 715 F.3d 44, 52 (1st Cir. 2013).

Rivera-Garcia cannot meet this demanding standard here. As we have noted before, "[t]he banner of outrageous misconduct is often raised but seldom saluted." Santana, 6 F.3d at 4; see also Luisi, 482 F.3d at 59 (noting that an outrageous-misconduct claim "has never yet been successful in this circuit"). This is not to say that an outrageous-misconduct claim can never succeed. See, e.g., United States v. Twigg, 588 F.2d 373, 380-81 (3d Cir. 1978) (outrageous misconduct barred conviction where a government agent set up a drug lab, supplied the key ingredient to make the drugs, purchased almost all of the other supplies, "was completely in charge" of the operation, and "furnished all of the laboratory expertise"). Rather, the point is that the "outrageous governmental conduct defense is an extraordinary defense reserved

for only the most egregious circumstances.  It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating."  United States v. Sneed, 34 F.3d 1570, 1577 (10th Cir. 1994) (quoting Mosley, 965 F.2d at 910) (internal quotation mark omitted); see, e.g., United States v. Simpson, 813 F.2d 1462, 1465-66 (9th Cir. 1987) (informant's use of sex to lure defendant into selling heroin was not sufficiently shocking).  Our cases recognize that "outrageousness, by its nature, requires an ad hoc determination" that cannot "usefully be broken down into a series of discrete components."  Santana, 6 F.3d at 6.[2]

"[T]aking into account the totality of the relevant circumstances," id. at 7, we do not believe it is "clear or obvious," Puckett, 556 U.S. at 135, that Rivera-Garcia's case should have been dismissed on outrageous-misconduct grounds.  We agree with Rivera-Garcia that his case differs from one in which the government simply insinuates itself into an ongoing criminal enterprise.  Here, the government was both the buyer and the seller in the drug deal; as far as the record discloses, no actual drug dealers were involved.  Cf. Greene v. United States, 454 F.2d 783, 786-87 (9th Cir. 1971) (prosecution was barred because the government became enmeshed in criminal activity from beginning to

---

[2]     Our holistic approach to outrageous-misconduct claims differs from some other courts' analyses, which involve multi-factor tests.  See Santana, 6 F.3d at 6-7 & n.9.

end by helping to reestablish and sustain bootlegging operations in which the government was the only customer). But it would be going too far to say that the government dreamed up this scheme to lure the unwary into malfeasance; by Rivera-Garcia's own account, the government was responding to a serious and ongoing corruption problem in the local police precincts. It appears that the government, having identified a recurring problem with police officers providing security for drug deals, simply substituted itself for the actual dealers in this particular instance. Thus, this is not a case in which the government "involve[d] itself . . . directly and continuously over . . . a long period of time in the creation and maintenance of criminal operations." See id. at 787. Nor did it provide Rivera-Garcia with "opportunities for successive escalating crimes as part of a sting operation." United States v. Fanfan, 468 F.3d 7, 16 (1st Cir. 2006). And, as other courts have noted, "the government can act as both supplier and buyer in sales of illegal goods" without running afoul of the outrageous-misconduct doctrine. Mosley, 965 F.2d at 912.

Similarly, Rivera-Garcia is right that, in his case, the government apparently did not take steps to ensure that he was fully aware of the nature and extent of the transaction beforehand. Cf. United States v. Gutierrez, 343 F.3d 415, 417, 442 (5th Cir. 2003) (no outrageous misconduct where agent posing as drug dealer would meet with corrupt police officers and "tell [them] in no

-10-

uncertain terms the specific nature of the transaction and the amount of cocaine involved").  But he points to nothing in the record before us (which, in light of his guilty plea, was not developed with this claim in mind) suggesting that he could have misunderstood what he was being asked to do.  In fact, as noted above, Rivera-Garcia stipulated to the fact that he and his codefendant "agreed to provide 'armed protection' for a drug transaction <u>on behalf of a person who they both thought was a drug trafficker</u>."  Thus, it would be difficult to conclude, on this record, that the government overreached by duping Rivera-Garcia into participating in the drug deal.

Nor does the record establish that the government coerced his participation.  Rivera-Garcia says that, upon arriving at the apartment, he was locked in with the "drug dealers," leaving him with the Hobson's choice of either staying until the drug deal was over or attempting to shoot his way out, but that fact does not explain how he came to be there in the first place.  And the $2,000 that he was paid does not, on this record, seem like so disproportionate an inducement as to imply governmental overreaching.  <u>See</u> <u>Mosley</u>, 965 F.2d at 912 (noting that "[v]ery large financial inducements . . . have also amounted to sufficient affirmative coercion to contribute to an outrageous conduct holding," but that "coercion of any type must be particularly egregious before it will sustain an outrageous conduct defense").

In any event, we do not suggest that Rivera-Garcia could not have prevailed on a properly supported, timely raised outrageous-misconduct claim. But he failed to raise such a claim below. That oversight not only impacts our standard of review on appeal, but also means that he relinquished the opportunity to develop evidentiary support for his claim, which is a significant handicap under the highly contextual, fact-specific outrageous-misconduct doctrine.[3] See United States v. Nunez, 146 F.3d 36, 38 (1st Cir. 1998) (affirming the denial of a pretrial motion to dismiss that lacked evidentiary support and noting that an outrageous-misconduct determination "must be rooted in the record" (quoting Santana, 6 F.3d at 6) (internal quotation mark omitted)). Thus, we are left with "the belated factual proffer contained in [Rivera-Garcia]'s appellate brief," id., some of which, as noted, contradicts the stipulation in his plea agreement. On the record before us, it is neither "clear or obvious," Puckett, 556 U.S. at 135, that the government's conduct in this case was "shocking to the universal sense of justice," Santana, 6 F.3d at 4 (quoting Russell, 411 U.S. at 432). Because Rivera-Garcia cannot clear this very high bar, he cannot show plain error, and we therefore reject his outrageous-misconduct claim.

---

[3] Of course, by pleading guilty, Rivera-Garcia also forsook the chance to argue entrapment at trial. Cf. Luisi, 482 F.3d at 59 ("[E]ven though the government's actions have risked giving the defendant a viable entrapment claim, it is another thing entirely to say that the conduct was 'outrageous.'").

## III.  Conclusion

For the foregoing reasons, we <u>affirm</u> Rivera-Garcia's conviction.